Okay, somebody can come and tell us how you're going to divide up your time. Your Honor, Brian Shulman on behalf of Mohave County, and also Valley Springs Lender. I'm under the impression that I have 20 minutes for both of my clients because of the two different appeals. I think that's their understanding as well. And I think counsel can talk about how they're splitting up their time. I just want to make sure that was your... Obviously the panel's impressions as well. I've got three cases in front of me. I've got County of Mohave versus Lexon Surety. I've got County of Mohave versus LJC Development. And then I've got Lexon Surety versus LJC Development. How's that last one going to be handled? Yeah, we can just talk informally as we try to figure this out. Sure, Your Honor. My understanding and Mr. Cunningham's understanding was that we were to share 20 minutes to address all three appeals. And so we've agreed to split the time 15 minutes for me on behalf of Lexon and the Lexon entities. And Mr. Cunningham would take five minutes. It was my intention to spend 10 to 12 minutes of my 15 on the appeal of Mohave County and the remaining three to five minutes of my time on Lexon's appeal on the third-party complaint. Well, let's have a go and see if we can keep all this straight. And just, Your Honor, while the caption is a little confusing with respect to the second appeal, Mohave County is really the appellant in only one appeal. That's the one against Lexon. Exactly. Right. And what's the Mohave versus LJC? What's that one? That would be, in that case, Mohave County is actually the appellee in that in that matter. Agreed, Your Honor. Good morning. Mr. Shulman states that correctly. So as to the appellee, so who goes first in arguing that one, if Well, we, in that particular case, we are the appellant. Counsel and I were talking beforehand, and it might be logical to have the claims between Mohave County and Lexon Insurance aired, and then counsel and I have agreed that I would take five minutes to address our claims back against the lender. Obviously, we're pleased to take them up in whatever order. You guys have managed to create an unholy mess. Let's start out, County of Mohave, you've got 20 minutes total. Why don't you argue 15, and we'll save for five minutes for something. Okay. May it please the court. We got three cases. Let me just read the numbers for the record. 15-17167, 15-17232, 16-16887, all of them being argued today. Thank you. Mr. Shulman. May it please the court, my name is Brian Shulman, and I represent Mohave County and Valley Springs Lender LLC. My intentions, subject of course to your direction and instructions, is to first address the decision concerning Lexon's liability on the surety bond. That's really the centerpiece of the case. Exactly, and to then reserve five to eight minutes of my time to respond to Lexon's comments in response, and to address Valley Spring, a state-separate appeal, which is against my clients. And the other parties or appeals are sort of conditional. If Lexon, I mean not totally a conditional, but fairly conditional, because the district court said it was moot because Lexon wins. Correct. That all the other claims were moot. Correct. There were arguments as to the merits of the Valley Springs estate's claims, but the district court decided it on mootness. Okay, thank you. Your Honor, this is a breach of contract case. There are several fundamental precepts that guide the analysis, and these are the building blocks. The first is that the general purpose of a surety contract is to guard against loss in the event of the principal debtor's default. The second is the terms of a bond issued by a paid surety shall be construed most strongly against a surety. The third is that the liability of sureties is to be determined by the specific conditions of the bond. But don't we have a different situation when the bond is based on a bond? That is one of the principles. That is, in my word, the sixth one. But all of these principles apply to this set of facts. But we can't take the bond just on its face, right? We have to look at the Arizona statute. Absolutely. That's right. Do we look at the Arizona regulations as well? Absolutely. Okay, so we have to read the bond as incorporating the statute and the bond. You still start with the language in the bond. You still look at the intent of the parties. You still look at these other guiding principles. But in that mix of factors that you consider in order to interpret the bond, most certainly you look at the statute and you look at the regulations underlying the statute. We do not dispute that. So is there a lot sale precondition in the bond, the statute, or the regulations? No. Well, maybe. I'm just reading the bond. I'm at the third full paragraph. It's on page ER 528. I'm sure you're familiar with the bond itself. This obligation is to assure the principal completes the subdivision improvements within the time specified. Well, completes is an interesting word. Completes suggest that it's already been begun. But nothing's been begun. That's not, that's not true, Your Honor. What's not true? The subdivision was almost 50 percent complete, Your Honor. The improvements were. So in your brief, you distinguished, first you said that, I forgot the name, Westchester Fire Insurance wasn't binding. And then you distinguished it because in that case, things had not been started. Well, yes, Westchester is not binding because it's a Florida case. Point two of Westchester is that the Lexon cited a district court decision in that case. And we can get into the language in that district court decision. But the third point that we made about Westchester is that the 11th Circuit then took up the case. And the language, if you read the opinion of the 11th Circuit, and I would make the argument if you read the totality of the opinion in the district court, their focus is on the commencement of the improvements. In other words, the construction of the improvements, whether that has begun or not. And they were looking at completion because the underlying ordinance also had the word, or the bond had the word, complete in it. And they were interpreting that. I mean, obviously Westchester is only going to be persuasive regardless of what the 11th Circuit said or not. But I thought you had said that this case was different than Westchester in any event because here work had commenced. That's correct. It had commenced. And let me be clear, we're not running away from Westchester. I believe that if you read both the district court decision and the 11th Circuit opinion, that language supports our interpretation of this bond, which is there is no lot sale precondition. The important points in Westchester are, one, the city did not attempt to construct improvements, nor did they even solicit bids for the improvements. Millions of dollars were at stake, but there was a one-page bond that failed to specify many of the terms that would clarify the party's rights and obligations. If you read the district court decision, in fact, the district court said both sides have made reasonable arguments because of the ambiguity in the bond, and then goes on with the analysis. If you look at our respect, it does talk about the need to complete the subdivision improvements. That does not address lot sales. That addresses the improvements, and we were well on our way on the improvements in this case. And so in order to prevail, as I understood, opposing counsel's brief, there has to be some requirement that the sale of lots has commenced in order for them to be liable. Correct. And you're saying that there is nothing in the language of the ordinance or the statute, but their argument is, well, but the purpose of it was clearly intended to merely protect the county from having to pay for once lot sales started. Why shouldn't we look for the purpose as they're arguing? You should look to the purpose. There's many purposes, though, to the statute. So let's talk about the purpose of the statute. And by the way, the cases that are cited, the language is not always the same in terms of what these cases say about the relationship between the authorizing statute and the bond. There are cases cited by both sides that stand for the proposition that the court should read into the bond any omitted terms of the authorizing statute. Now, that's different than saying that you should change the terms of the bond based on a purpose of the statute. So keep that in mind. But let's look at the authorizing statute. That's ARS 11821C. And in that section, the relevant language says, the regulations shall require the posting of performance bonds, assurances, or such other security as may be appropriate and necessary to ensure the installation of required street, sewer, electric, and water utilities, drainage, flood control, and improvements meeting established minimum standards of design and construction. I'm emphasizing this last part. First, no mention of lot sales. But there is a reference to meeting established minimum standards of design and construction. If you go to the regulations, which are part of our addendum, if you go to section 5.1D of the underlying regulations, there are, and that's in our addendum starting on page 78, there are about five pages in those regulations that define what minimum required improvements are. So, what this statute means and what all these cases are talking about is that in this context, the bond does not define what the minimum required standards are. But the regulations do. And in order to follow the case law that talks about reading the statute with the bond, you could, in a hypothetical, argue that these minimum required standards that are set forth in the regulations are part of the bond. Because you have the connection. You have the bond. You have the case law that says you read the bond based on the authorizing statute. You have the authorizing statute that says that any insurance bond must meet these minimum standards. And then you have the regulations that set forth the minimum standards. I get all that. As I understand the sort of the narrative that leads us to this point, at the outset, the county was not inclined to enforce them, to sue to enforce the bond. Is that correct? It indicated at the first, it would just say this, we'll just call the whole deal off. There's been, no lots have been sold. We'll just, you guys do what you're going to do, but we're not going to enforce the bond. Is that right? Well, that's an, I would argue that's an oversimplification. I don't know that they based their decision on whether or not lots were sold, but I'm sure that that was a consideration. But the short answer is at the outset, the county was not about to sue to enforce the bond. I mean, I'm basically recounting a narrative I read in the brief, and I want you to tell me whether it's true or not. The county is then pressured by the lender to bring the lawsuit. If you don't bring the lawsuit, we're going to sue you. The county then brings suit against the surety, is that right? Well, that is Lexon's characterization of the facts. That's not the facts. Okay, what is true then? There was an early recommendation that was going to be made to the Board of Supervisors not to pursue the subdivision, which would then allow for pursuit of the bond. They were going to give up the subdivision. The county is not in the business of building subdivisions, so that... I'm not treating the county as a bad guy here. I'm just trying to figure out... No, I understand. I understand. So Valley Springs Lender, which was the lender on the deal, stepped up and agreed to take over the subdivision. So now, all of a sudden, the county had a dance partner that they didn't have before to complete the subdivision. And keep in mind... Was there no threat ever by the lender against the county to bring suit? The lender wrote a demand letter to the county stating the lender's position that the county had an obligation to go after the surety bond. Was there any threat of lawsuit in that letter? Your Honor, the letter is part of... Can you match between the lines? Your Honor, I'm not trying to be coy. I don't have the letter memorized. The letter is part of the record. I don't remember, frankly, whether there was a threat of litigation or not. I would argue it's irrelevant, but... One way or the other. And then, is it true, finally, that any proceeds from this lawsuit have been assigned to the lender? The agreement is that if the county is successful in its claim on the bond, the bond proceeds will be used to complete the subdivision. And Valley Springs Lender has agreed to finish the subdivision using those proceeds. That is to say, the proceeds have been assigned, then, to the lender. That's the answer? Well, I understand your question, Your Honor. I think I understand your answer, but I'm not sure. The county has committed to use the proceeds to complete the subdivision. So, if Valley Springs Lender hires some... This is my point. If Valley Springs Lender... It's a lender. It's not a contractor, either. Valley Springs Lender, if this subdivision moves forward, would hire subcontractors or contractors. That money, eventually, would get into the hands of the contractors, not Valley Springs Lender. That's my only hesitation with your characterization, Your Honor. But the substance of then that was alleged in the brief, you may recharacterize a little bit, but it sounds like it's roughly that's the story. Right. And that's an important factor, that the county does have a dance partner to finish the subdivision, which the county initially expressed an interest in doing. And I understand we've addressed it in the brief, so I want to address it here. Lexon goes to great lengths to portray this nefarious reasoning behind all of this, and it's a business deal. Back with respect to the purpose argument, we don't deny that one of the purposes of this bond and any surety bond for subdivision improvements is to protect future homeowners. But the fallacy in Lexon's argument is that they elevate that purpose over all the other ones that are cited in all the other cases, and says that in order to obtain this purpose, we should ignore all the other purposes. And in fact, we may construe the bond in a way that is antithetical to these other purposes, which have to do with protecting municipalities and ensuring that municipalities are given great deference in making their decisions about which subdivisions they want to move forward on. So the court, the district court was impressed by the thought that if everything stopped now, the county would have no expenses, because the county wouldn't have the obligation to implement improvements for people who are living there. And so therefore, I think it characterized it as there's no damages to the county. But isn't that the case that the county's standing right now doesn't have any financial responsibilities with respect to the development? No, Your Honor. I mean, right now, there is a plat of land that is sitting empty, but that doesn't mean that the county doesn't have responsibilities associated with it. So there are some, but more to your point, Your Honor, and this goes to the law that talks about damages in the context of a suretyship case, make it very clear that in this case, the county, its damages are its expectation damages, the money that it was entitled to under the bond, under the contract. So I agree with the way that you characterized the district court's I think that analysis was wrong. Now, what obligation has the lender now undertaken with respect to the development? Is it agreeing to go forward with the development, irrespective of whether or not you win your lawsuit? The present, yes, under the development, there's a contractual agreement between the lender and the county called the development agreement, in which the lender has agreed to undertake the improvements. And is it contingent upon your success in this lawsuit? I don't believe so, Your Honor. Then how has the county been damaged? That is to say, you've got a substitute developer who's gonna do the development that was previously promised, and it's gonna happen whether or not you win this lawsuit. Where's the damage to the county? Your Honor, again, these cases are very clear in this regard, that there is an expectation damage. The expectation of the county is that it will have a completed development at no cost to it. And it sounds as though that's about what you're gonna get, assuming the lender is a capable developer. Well, Your Honor, let's play this out. Let's say that Valley Springs Lender does not move forward with the improvements. That case has been damaged. Well, then you've got a lawsuit against them. So you have a breach of contract at that point with the lender, and what you're saying is... And you also have a breach of contract with Lexon, because you did have a contract with Lexon that they would pay for that. So why would we hold these two breaches of contract differently? I agree. The initial contractual relationship can't be ignored just because a substitute developer has come in and agreed to take over the project. In fact, at my break, there's a case directly on point in this, on this issue, and it says that just because the municipality has found a substitute developer doesn't mean that the underlying surety is relieved of its obligations. I see that I have about two and a half minutes left, so I'll reserve. Thank you. And I do make these rash promises. You'll get a chance to say what you need to say. Thank you. Good morning, Your Honors. May it please the Court. I'm Matthew Sloan. I represent Lexon Insurance Company, Lexon Surety Group. The issue in this particular appeal is whether or not this court should affirm the district court's granting of summary judgment on behalf of Lexon and denying the summary judgment motion filed by the county. And I think this court should affirm for two reasons. First, because the predicate for liability of Lexon under the bond, namely the sale of lots, has not been triggered. Where is that? I certainly didn't see it in the language of the bond, in the statute, or in the ordinance. It's not in the bond, it's not in the statute. The ordinances do talk about the only time, and it's under Section 1.7D, I believe, that the county is required to make a claim upon the bond, is if lots have been sold. Right, but that doesn't make it a precondition to Lexon's obligation on the bond. It does not. But Arizona law is clear that the bond should be construed in connection with the statute and the case law construing that statute. And Arizona law is clear that the bond should be construed in connection with the statute and the case law. And Arizona law is clear that no citizens are stuck with a piece of property in the county, in the city, whatever the municipality may be, without the required improvements that they need to live in that property. And secondarily, that the county or the municipality does not incur any expenses they have to provide. So I saw general purpose language, but I didn't see anything in the cases suggesting that a precondition to the surety's obligation was sale of a property. The only thing that I saw that was specific, it was just sort of generalized purpose language. So is that what you're relying on? Yes, the general purpose language. There is no case that I'm aware of that says there is an implied precondition that lots be sold. But if you look at what the purpose of the statute is, the purpose would not be served here by awarding any of the funds under the bond to Mojave County. And when we're talking about Mojave County here, as the court noted, we're really talking about Valley Springs Lender, because Mojave County never had any intention of bringing a claim on this bond. What's the best case to say that we read the policy concerns or the purpose into the bond? There's a couple of cases. I would say Norton v. First Federal Savings, that's 128 Arizona, 176. And what's the language in there that you're relying on for that? I don't have a language in front of me, Your Honor, but it very clearly discusses the purpose, and the purpose being twofold. One, to make sure that citizens do not have homes without... That describes the purpose, but what's as you read the purpose into the bond? What's the best? That in interpreting the bond, you have to construe it as if the purpose was written into the bond. What's the best? That would be the United States Fidelity and Guarantee Company v. Christoffel, 115 Arizona 507, which says... That says that such statute constitutes a part of the bond? No, that's the case that says where a bond is given under the authority of the statute, it must be given the effect which in reason must have been intended by the statute. And so we can talk about what's really intended by the assurances that are required under the statute. In Mojave County, in the land regulations which you have, the county has two options for obtaining assurances that the improvements will be completed. One is a performance bond, a subdivision performance bond, as we have in this case. And the other one is a property escrow trust agreement. Now, two things. One, as it relates to subdivision performance bond, I don't disagree with the idea that a bond should be construed against a surety in most cases, and specifically in those cases where the surety has actually drafted and issued the bond. The bond at issue in this case is not a Lexon bond, it's a county bond. It's a form that's specifically attached as Exhibit 8 to Mojave County's land division regulations. So if you're gonna construe the bond or any ambiguity in the bond against anyone, it should be construed against Mojave County, not against Lexon. Is there an ambiguity in the bond? I don't think that there is. We obviously disagree on the interpretation of the language with respect to completed and with respect to the word required. Lexon's position is there are no required improvements in the subdivision right now because there are no lot owners. So when you look at the two different forms of assurances, subdivision bond and the property escrow trust agreement,  that Valley Springs lender has provided as the new developer on the project. And what a property escrow trust agreement is, it's an agreement whereby all of the property in the development is put into trust and none of that property is released out of trust until the county is satisfied that all of the improvements are completed. So under that form of assurance, the county has no guarantee and no expectation that it will ever get the improvements completed. Why is that relevant? That's not what Lexon entered into, right? Well, that's not entered into with respect to Valley Springs Estates, the original developer. It is with respect to the subsequent developer. And I think it's relevant to go to what the county's intent was. But that's not... But Lexon didn't enter into that sort of agreement. I mean, Lexon just says if the original developer defaults, then Lexon will pay for the improvements. That's correct. But I think it's relevant to going towards what Mojave County's expectation and intent was with respect to the bond. If you can have two forms of assurances, one of which the property escrow trust agreement never guarantees that the county will have any improvements completed. There's no funds in a property escrow trust agreement for the county. So when you talk about what the county's expectation is, talk about expectation damages, the county's expectation here, the benefit of its bargain under the bond, was not that if there was a default, it would get paid. It said if there was a default, the county would not have to incur any of its own funds to construct improvements. There's no dispute here that they don't... They have not yet incurred any expenses to construct improvements, and they never will have to incur any expense. How do we know that they never will? Let's just say we've been... Toward the end of the earlier argument, we went through what I'll call mitigation possibilities. And one of the arguments is that the county has mitigated its expectation damages by contracting with the lender, who's now the new developer, so that everything will be built, we'll have the improvements done, the lots will be sold, doesn't go through. Well, in the current situation... I guess that's not a successful... That's a possible mediation, but at this point, it's only a contractual obligation, and as we all know, contracts are not always fulfilled. Sure. One of two things is gonna happen. While Valley Springs Lender is still on the clock with respect to its development agreement with the county, no lots can be sold until the improvements are completed. So there's no citizens at risk of... And the county's not at risk of incurring any expense. Secondarily, the county retains the right, and I believe the development agreement with Valley Springs Lender expressly continues their right, to revoke the plan at any time. The only way the county's ever gonna have exposure is if it allows a developer to sell lots to individuals without any improvements being constructed. So are you saying... Am I understanding this right? You're saying that Lexon's on the hook only if the developer doesn't default? No, if the developer defaulted... If the developer doesn't default then and you're on the hook, but if the developer defaults and the improvements aren't built, then Lexon's not? Lexon is only on the hook to the extent the county would have to incur any costs to complete the improvements. Lexon's position is that if no lots have been sold, the county has no damages because it has no obligation... But no lots can be sold unless the improvements are completed, you just said. That's under a property escrow trust agreement, the current agreement that they have with Valley Springs Lender. The agreement with the original developer was different, that's why there was a bond put up because the developer under the original agreement, Valley Springs Estates, they were allowed to go out and start selling lots immediately because they had the benefit of the bond to protect the county. So had a single lot been sold, then Lexon's contention is it would have had liability, not for the full amount of the bond, but only for the amount of the expenses associated with providing the required improvements to that lot. If it was two lots, 10 lots, 20 lots, the liability under the bond would go towards whatever the county's expense would be. That's a complicated provision that's nowhere, anywhere. It's nowhere in the bond or anywhere else that I can see. It's not, but I think when you look at what the purpose of the statute is, 11821C, when you look at what Arizona cases the Supreme Court... Arizona is actually very good about contracts. They say, we give effect to the language of the contracts, and here they say, we give effect to the language of the contract and the statute and ordinance. I've never seen an Arizona case saying, we give effect to things that are floating in the air that people might have intended somehow. I've never seen an Arizona case saying that. Yeah, I mean, the reality is in this circumstance, we've got some pretty clear guidance from the Arizona courts about what the purpose of the bond is. And paying money to Mojave County so that a third party developer can get improvements made at no expense to them is not the purpose of the bond. The purpose is to protect the citizens of Mojave County from A, having homes with no improvements, or B, having to have money come out of the general fund to complete improvements because a developer has not been able to. Let me ask you it this way. Let's assume that the lender, who's now the developer, defaults tomorrow. Are you saying the county has suffered no harm? As it relates to the bond, yes. Well, what's happened in the real world is that we've got these sort of structural improvements that are halfway done. That's correct. In other words, we've got land that's all kind of crapped up. There was previously, I assume, undeveloped land. Now we've got land, I've not seen a picture of it, but I assume we've got some trenches. It's not land that people would sort of happily ride their horse across anymore. Is that not harm to the county? It's not harm to the county. And in fact, if you... Cause? The county has... Lots of developments fail for a variety of reasons. Public developments, private developments, not all of them have a subdivision bond associated with it. So the county's in situations all the time where you'll have a development that will fail and you'll be left with unsightly or difficult conditions on the property. Well, but that's what I'm saying. Isn't the unsightly conditions that I'm kind of imagining, because I've not seen a picture. But let's assume that the land is no longer in sort of a nice desert with some, I don't know, some cacti and so on. It's now land that's got trenches and piles of dirt and so on. That strikes me as... That's not a very nice thing to have happen. That strikes me as, if it's county owned land, that that's a bad thing for the county. Or if it's not even county owned land, it's a harm to the county and its citizens because you had land that looked kind of nice and now it's a mess, and it will possibly go forward into a completed development. So what I'm after is not what happens if the current lender completes the development. And if that happens, because it's not contingent upon success of this lawsuit, the county's held harmless. But what I'm thinking is, what happens if the current lender breaches, leaving the land in its current state? That strikes me as possible harm to the county. Well, while that may be possible harm, there is no current actual harm. The county testified that there are no unsightly or dangerous conditions on the property that it believes have caused any harm. But there's an alternative remedy, Your Honor, for that specific situation. Valley Springs lender foreclosed and acquired the property. It's the same remedy that any county, city, or state would have when one of its citizens has property that's in an unsightly condition. They turn to the owner of that property, in this case, the lender, and say, you need to clean up the property that you own. They bought the property as is at a foreclosure sale. If it has dangerous conditions or if it's unsightly, that's a responsibility of the landowner to take care of it to the extent the county cares. Now, the county has not, and there's no evidence in the record, that the county ever suggested at all that it had instructed Valley Springs lender to take care of any conditions on the property. The county has been content over the last three years to let the property sit in its current condition. And again, the condition of the property is not the responsibility of Lexon under the bond. The condition of the property is the responsibility of the property owner, which is Valley Springs lender. I want to quickly go back to an earlier question about how to understand your argument that the purpose of the statute should be read in the context of the language of the bond, the statute, and the ordinances. And the case that you cited, perhaps this is parsing words, talks about what was intended by the statute. It seems as though the statute, the intent of the statute is to secure a bond. It doesn't seem like intent and purpose are the same words, equally substitutable, as though the purpose, this broader purpose about citizens not having access to necessary improvements, that that purpose doesn't seem to be the intent of the statute. The intent of the statute is not that a bond be provided. The intent of the statute is that an assurance be provided. A bond is one form, the property escrow trust agreement is another form. They both provide an assurance to the county that it won't incur any expense vis a vis the development. In the property escrow trust agreement context, the county will never have to incur any expense because no lots can be sold until the improvements are done. The subdivision bond is different. Lots can be sold before the improvements are done, but the bond provides the funds from which the county can complete those improvements in the developer defaults. So the intent of the statute is not to provide a bond, it's to provide an assurance of two things. One, that no citizens will ever have a home without the necessary improvements, and two, that the county and its citizens won't have to incur the cost relating to that. I'm almost out of my time. I'd like to reserve my last minute for Lexon's appeal on a third party complaint and turn it over to Mr. Cunningham, unless you have any further questions of me. Thank you. Thank you. May it please the court. My name is Whitney Cunningham with the law firm of Aspie Watkins and Diesel in Flagstaff, Arizona. I'm here today on behalf of my clients, LJC Development, who was the developer, Valley Springs Estates, which was the company owning the subdivision, and Leo Crowley, who's an individual acting as guarantor to the bond that you've been listening to discuss this morning. We are appellant on two claims, and as to that number 1616889, which has to do with mootness as between claims of my clients with Lexon, I would submit that on the brief. What I wanted to talk to you today about, and of course answer any of your questions, are what happens in the event of an adverse ruling in this court today? Because Mr. Crowley, my client, a retiree, isn't the one who actually might end up having to pick up the check, depending on what occurs. But the bond is not the only contract that issued. Mr. Crowley, also having guaranteed the construction loan, ultimately entered into a settlement agreement with Mr. Schulman's client, the lender, a settlement agreement to buy his piece. When Mr. Crowley did that, the lender, represented by Mr. Schulman's firm, negotiated to release Mr. Crowley from any claims having to do with that construction loan or anything directly or indirectly related to that loan or the lawsuit that had been brought. In exchange, the lender took the proverbial bird in the hand in the form of $250,000 paid by Mr. Crowley, again, to buy his piece. It was, to copy Mr. Schulman's phrase, a business deal. And what we have sought in the underlying litigation is that it be enforced. Because what's happened is that the lender has tried to do an end run, to do indirectly what it has contractually prohibited from doing directly. So you agree that the lender has not sued Mr. Crowley? So your theory is not that the lender breached its agreement by suing Mr. Crowley. You're just saying that the lender financed the county's suit against Lexon, and that if the county prevails against Lexon, then Lexon can enforce its guarantee agreement with Mr. Crowley. Am I understanding that correctly? I think what you've expressed is correct, but I think that there's even more. But didn't Mr. Crowley know that... I mean, didn't the agreement itself say that Mr. Crowley would help with lawsuits against Lexon? That was the thing that puzzled me. I mean, obviously, Mr. Crowley signed an agreement knowing that there was going to be a lawsuit against Lexon. Well, not necessarily. But what the lender wants to do with regard to paragraph 10, which is the cooperation clause, as well as paragraph 5, which is the release clause, is paint with a very broad brush and disregard the details. Paragraph 10, which is the cooperation clause, says that Mr. Crowley will cooperate only if it means no cost or minimal cost to him. And now that he's the one that everyone's pointing the guns at in terms of who's ultimately going to pay, that's clearly not true. Well, he knew he had... That there was a guarantee that he was guaranteeing Lexon's liability. He signed the agreement. Well, actually, what he knew was that in paragraph 5 of his agreement with the lender, he was released from any direct or indirect liability that might come from the lender's side. And then here's what happened. The lender coerced, and coerced is the correct term because the Mojave County officials testified at deposition that they felt threatened by the litigation. The lender coerced Mojave County into entering into this December 2012 development agreement. It then funded the litigation by Mojave County against Lexon. And of course, Lexon brought Mr. Crowley in as a third party defendant. So ultimately, Mr. Crowley is left having to cut the check to Lexon in indemnity, which is turned over to the county, and the county has contractually obliged itself to turn the money over to the lender. And so what happens is the lender collects Mr. Crowley's money indirectly, knowing that it can't do it directly. And paragraph 5 of the settlement agreement prohibits them from doing that. This is a straight up breach of contract. It's also a breach of the duty of good faith and fair dealing because the lender is acting to deprive Mr. Crowley of the very benefit for which he paid a substantial sum of money in order to buy his piece. Now, if we were to sustain the district court, does your client have any dog in the fight at that point? Yes, Your Honor. And of course, procedurally, we're in front of you, not on the merits, but procedurally, because our claims were rendered moot. Here's what I would say. My question is, are they really reasonable if we sustain the district court? Yeah. They might be, but the district court didn't determine prevailing party and didn't make awards of attorney's fees. Based on what the district court ultimately does, in other words, in our opinion, the district court properly assigns liability, in this case, to the lender and puts the lender on the hook for the various litigation costs, then yes, this claim would be moot. But the court declined to do that, at least yet, and I believe is waiting for this court to rule on the other substantive matters. The issue then, of course, is that to the extent that Lexon is not made whole by the lender in the underlying litigation, it can still turn to my clients to seek further indemnification, and that's why we believe this claim remains live and should be returned to the court. If the court has no further questions, I'll cede my time. Thank you. So whose turn is it? Mr. Shulman? Mr. Shulman, who's your client? We have two clients, Your Honor. We have Mojave County and Valley Springs Lender. And who's paying the bills? Valley Springs Lender. Just wanna make sure that... The county really looks to me like a cipher. I understand it's in the name of the county, but it does not sound as though this suit is being brought for the benefit of the county. It is being brought for the benefit of the county lender. Those are not... The proceeds of the suit, if you win, don't go to the county. The proceeds would not go to the county regardless, because it would go to whoever is making the improvements, whoever's building the subdivision. The money's never gonna go into the county's pocket. If the county was in the business of constructing subdivisions, then perhaps the money would somehow get into that section of the government that builds subdivisions, but... But if the money that it would otherwise not pay. That's to say, if the county wins, it doesn't get to keep the money. If it loses, it doesn't have to pay any money. Am I missing something? I think that's generally a fair statement, Your Honor. So the county really does not have much of a dog in the fight. It has a dog in the fight as any government entity that is interested in a subdivision improvement or other development that it has gone through the regulatory process of approving. But it sounds as though the development is going to go forward, given the contract with the lenders, whether or not you prevail in this lawsuit. Well, yes, that's certainly the party's expectations. And that brings me back, Your Honor. You had raised this before, and I said I thought that there was a case directly on point. And it's the town of Poughkeepsie case that we cited in our briefs. And in that case, the facts are very similar. You hate it out of circuit precedent. That I hate it? Well, when you don't like it, you do. No, I don't hate it. In that case, the town was able to reach an agreement with the bank, whereby the bank agreed to make arrangements to complete the project pursuant to the site plan at its expense in consideration for the any monies received to the bank. Sound familiar? The suggestion that the bank's arrangements for the completion of the project relieves Republic, which was the surety in that instance, of its contractual obligations to the town, which is still subject to the claim of the bank, is rejected by this court. So there's a case directly on point. We're talking about harm, and frankly, I think that that is being used as shorthand for contractual damages. And they're not the same. In this case, and we've cited them in our briefs, we have established expectation damages on behalf of the county. They have those expectation damages. Whether or not the... I don't understand how you have expectation damages in the sense that win or lose, there's no financial impact on the county. That is to say, if you win, the money goes somewhere else. If you lose, there's no money coming out of the county. It sounds like the county's fully mitigated. Well, if the county decided... If the county did not have a lender to step up to agree to pursue the subdivision, and the county just wanted to go after the bond, which it would still have the right to do, you could make that same argument, saying that they haven't been harmed yet. But that's the idea of an... These are expectation damages. The expectation is that, in this case, Lexon will... The question is elementary contract law that you can mitigate damages, whether they're consequential or expectation. And it sounds as though the county might have mitigated damages, because if the expectation is a completed subdivision that will make, I don't know, good taxpayers in the county and so on, that's what they're gonna get. They've got a contract to accomplish that. Have the lenders agreed to be on the hook for the improvements, regardless of the lawsuit? I did look at the development agreement at my break, and they are committed under the terms of the contract to pursue the development, regardless of the success of the county's appeal. My argument, again, based on Poughkeepsie and the other cases that we cited in our briefs, is that that doesn't matter. And in fact, if you took that position, you would actually be discouraging the county and others who are beneficiaries of a bond from pursuing any efforts to mitigate their damages. And it lets the sureties off the hook completely. So if the original developer defaulted, the county could, you're saying, could have gone after Lexon without getting any other developer on the hook, is that correct? I think theoretically, I think that was a possibility. And that might have then made it more attractive to getting a new developer in there, but it turns out the new developer's willing to come in without making that a contingency of the bond. But I do find that the county, again, is not in the business of building subdivisions. So there... It was a mutually beneficial business deal for both the lender and the county, because it's a subdivision the county wanted, and it was a subdivision the lender, which already had money sunk into, was willing to pursue. But I'm trying then to figure out, well, what was the deal the lender made with the county? The lender made a deal that we will pursue the development irrespective of the recovery in this lawsuit. Yes. Yes. I have a few more comments. I don't know if... Well, let's have a few more, see if they're interesting. Okay. I do want to address Westchester, because I feel like the county is in the position where we're almost needing to prove a negative. The only reason we are here today is because Lexon has come up with this idea that there's a lot sale precondition, and they're basing that on Westchester. And if you actually read Westchester closely, there is no lot sale precondition. It's a fabrication. In the district court, the district court enumerates five different arguments made by Westchester. One, two, three, four, five. Not one of those arguments that is made is that no lots were sold. It wasn't even an argument that was made by either party in the district court decision. The closest argument is that the development was not constructed or even commenced. That's a distinguishing fact. In the 11th circuit, it's even more clear. The 11th circuit begins with, I quote, we conclude that the bonds impose no obligation on the surety to pay the city to complete the agreed upon infrastructure improvements because no construction of the pertinent improvements commenced. The 11th circuit ends the opinion with the exact same language. On top of that, when it describes the district court holding, the 11th circuit said, the surety's obligation is, quote, subject to an implied condition that payment for the improvements is required only if construction commences. Our contention is that there is no lot sale precondition that has been recognized by any court in any jurisdiction in the United States, let alone in Arizona. Thank you. Why do you get to talk again? Because Lexon had an dismissal of its third party complaint as being moot. Okay. And I'll just make two points. It's not moot. The obligations of... Even if you win this current appeal, it's not moot? That's correct. It's not moot because the obligations of the indemnitors under the general agreement of indemnity are independent. And even if we win this appeal and we ultimately get an award of every single one of our fees and costs from Valley Springs Lender, there's no guarantee we'll ever collect that money from Valley Springs Lender. It won't include, most likely, the expert fees that Lexon has had to incur in connection with this lawsuit. So there are other damages that Lexon has an entitlement to under the general agreement of indemnity. So you're still after poor Mr. Crowley? Still after poor Mr. Crowley, yes. And on what ground are you still after poor Mr. Crowley? He signed a general agreement of indemnity agreeing to indemnify Lexon for all costs and expenses that Lexon incurs associated with any bonds that Lexon issues on... You prevail in the dispute you've got with the county, I'll call it with the county. How much money are we talking about you may be going after Mr. Crowley for? I don't know because it'll be the amount of attorney's fees and costs incurred in both the district court action and in this appeal, as well as expert fees. So you'd get all your attorney's fees in litigating this from Mr. Crowley? Well, we presumably get an award against both the lender and Mr. Crowley, and hopefully between the two of them, we would get recompensed all of the fees and expenses. How are the attorney's fees... What's the basis? Is it a contractual attorney's fees thing? As to... Are you talking about the indemnitors or as to the lender? Let me talk about both. Well, the general agreement of indemnity is a contractual basis. As to the lender, it would be under Arizona Statute 12340.101, which entitles the prevailing party to recover attorney's fees in an action arising out of contract, as well as 12348, which is specific provisions as to civil actions brought by the state, the county, or any cities. So if you were to prevail, it sounds though, you'd get all your attorney's fees out of them. Theoretically, we could get an award for all the fees out of them. But I maintain that just because we get an award from them doesn't mean we're not also entitled to an award against the indemnitors. And contrary to what the district court suggested, there wouldn't be any double recovery. If we got an award against the lender and the same award against the indemnitors, if either one of them pays a dollar, that's a dollar that would offset the amount that's owed by the other. Priority between the two? Can you go after Mr. Crowley first, or do you have to go after them first? I don't think there's any priority. We have independent judgment on the general agreement of one hand, on a contract basis, and on a statutory basis against the lender, again, assuming those fees are awarded. And the district court has discretion, so there's no guarantee that as it relates to the lender, the district court will award any of the fees, let alone all of the fees. Okay, thank you. We're finished? There are multiple cases involving the county of Mojave now submitted for decision. Thank all of you for quite useful arguments.
judges: W. Fletcher, Ikuta, Freudenthal